# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
August 7, 2012 Session

## STATE OF TENNESSEE v. HARRY COLEMAN

**Direct Appeal from the Criminal Court for Shelby County**
**No. 09-03572    John T. Fowlkes, Jr., Judge**

---

**No. W2011-01546-CCA-R3-CD  - Filed February 1, 2013**

---

A Shelby County Criminal Court Jury convicted the appellant, Harry Coleman, of second degree murder, aggravated assault, and two counts of assault. After a sentencing hearing, he received an effective eighteen-year sentence. On appeal, the appellant contends that the evidence is insufficient to support the convictions and that he is entitled to a new trial based on newly discovered evidence. Based upon the oral arguments, the record, and the parties' briefs, we affirm the appellant's convictions and the trial court's denial of the motion for new trial. However, the case is remanded to the trial court for correction of a clerical error on two of the judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed, and the Case is Remanded**.

NORMA MCGEE OGLE, J., delivered the opinion of the Court, in which THOMAS T. WOODALL, and ROGER A. PAGE, JJ., joined.

Joseph A. McClusky (on appeal), William D. Massey (at trial and on appeal), and Leslie Ballin and Steven Ferese (at trial), Memphis, Tennessee, for the appellant, Harry Coleman.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Eric Christensen and Paul Hagerman, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## I.  Factual Background

In May 2009, the Shelby County Grand Jury indicted the appellant for the second degree murder of Robert "Dutch" Schwerin, Jr., the primary victim. The grand jury also

indicted the appellant for two counts of aggravated assault with a deadly weapon, one count of assault, and one count of employing a firearm during the commission of a dangerous felony.

At trial, Katie Johnson testified that she was twenty years old at the time of the crimes and was dating Dallas Schwerin, the victim's son. On February 6, 2009, Johnson ate dinner with the Schwerin family at Villa Castrioti in Memphis to celebrate a birthday in the Schwerin family. Johnson said the victim had "a couple" of alcoholic drinks during dinner. After dinner, Johnson walked into the parking lot with the victim and his then fifteen-year-old daughter, Savannah. When they got to the victim's Yukon Denali, they discovered that a Hummer was parked very close to the driver's side of the Denali, which angered the victim. Savannah[1] got into the driver's seat of the Denali, but the Hummer was parked so close that she had difficulty getting into the vehicle. Johnson got into the back seat of the Denali on the passenger side. The victim stayed outside the Denali.

Johnson testified that a black Land Rover pulled up and that the appellant's wife, Katheryn Coleman, got out. Mrs. Coleman stood behind the Denali so that Savannah could not back the Denali out of the parking space. Johnson said Mrs. Coleman told someone, "'Go get my husband[.]'" Then she and the victim, who was standing in front of the Denali, began yelling and cursing at each other. When the appellant arrived, Mrs. Coleman walked between the Hummer and the Denali. Johnson said that Mrs. Coleman was standing right in front of the victim and that the victim was "trying to get her away from him and he was like, moving her back." Johnson said that the victim gently pushed Mrs. Coleman and that "[i]t wasn't a shove, it was just a little, get off of me." Johnson said that the victim was "putting out his arms" but that the appellant's wife continued to approach him and "just kept being in his face and wouldn't move."

Johnson testified that the appellant told the victim, "'You touch my wife again, I'll blow your brains out.'" Johnson said that she did not remember the victim's reply but that Mrs. Coleman "got back in [the victim's] face." Johnson said the appellant walked to the Hummer, "rummaged through some stuff," and got a black handgun. He went to the victim, put the barrel of the gun into the victim's mouth, and held the victim's head with his left hand. Then the appellant "backed off" and shot the victim. Mrs. Coleman was standing behind the appellant at the time of the shooting.

Johnson testified that she did not remember seeing the appellant use a telephone during the altercation. She said that at some point during the altercation, "[a]nother guy came up and tried to stop everything, but he left, he walked away, because he didn't want to

---

[1]Because some of the witnesses share surnames, we will refer to them by their first names for clarity.

get shot himself." Johnson never heard the victim threaten the appellant, Mrs. Coleman, or the appellant's dog. She also did not see the victim push Mrs. Coleman to the ground or "swing" at her. After the shooting, Johnson saw the appellant's gun in the right back pocket of his pants.

On cross-examination, Johnson acknowledged that she gave a statement to police on February 7, 2009. According to her statement, the appellant called 911 during the altercation to report that someone was cursing at his wife. Johnson acknowledged that after the victim discovered the Hummer parked close to the Denali, he began cursing and pacing back and forth. She had never seen him act that way and did not see him vandalize the Hummer. Mrs. Coleman did not walk up to the victim until the appellant arrived. The man who tried to intervene during the altercation was wearing a white shirt and white pants; he was not wearing a white robe. After the victim gently pushed Mrs. Coleman, the appellant got a gun out of the Hummer. When the victim saw the gun, he stopped cursing and backed away. The appellant forced the gun into the victim's mouth. Then he shot the victim, and Mrs. Coleman fell to the ground. Johnson said that after the appellant shot the victim, he "panned" the gun back and forth "[l]ike he was going to shoot somebody else, if they came close." The appellant appeared angry, not sad. Johnson acknowledged that she did not tell the police that the appellant said, "If you touch my wife again I'll blow your brains out." She also acknowledged that the victim was a "pretty good size man" and that he was larger than the appellant and Mrs. Coleman.

Asia Smith testified that at the time of the crimes, she was dating the victim's son, Colt Schwerin. On the evening of February 6, 2009, she ate dinner at Villa Castrioti with the Schwerin family. After dinner, she walked to Colt's truck with Colt and his brother, Dallas. They drove to the victim's Denali, and Smith saw the appellant's wife standing behind it. Smith and Colt got out of Colt's truck and walked to the victim's vehicle. The appellant's wife accused the victim of vandalizing her Hummer, and the victim called the appellant's wife a "bitch." Smith said that the victim and the appellant's wife were "just getting mad at each other, because she wouldn't let him leave and he was frustrated by it, because he just wanted to go home." She said the appellant's wife "got up in [the victim's] face" and told another woman with her to "go get her husband."

Smith testified that when the appellant arrived, he "got in [the victim's] face. Then he went to the Hummer, opened the front passenger door, and got a gun. Smith said the appellant put the gun to the victim's temple and "drug it down to his mouth." She stated that the appellant and the victim were "having words with each other" and that a man stepped between them. Smith said the appellant's wife was hitting the victim's chest, so the victim "stuck his arm out to push her away." She said that the appellant's wife "got in [the victim's] face" again and that the victim pushed the appellant's wife. The man standing between the

-3-

appellant and the victim tried to stop them and tried to get the appellant to put the gun away. When the man moved out of the way, the appellant shot the victim. The appellant's wife fell to the ground, and the appellant put the gun into his back pocket and waited for police. Smith said Colt was "freaking out" and told the appellant, "'You shot my dad.'" Smith never heard the victim threaten the appellant, his wife, or his dog, and she did not see the victim make any aggressive motions toward the appellant or hit the appellant's wife. She also did not see the appellant make a telephone call while he was retrieving his gun from the Hummer.

On cross-examination, Smith acknowledged that she gave a statement to police on February 7, 2009, and that she told the police Colt tried to calm the victim. She did not tell them that a man tried to intervene or that the appellant dragged the gun down the victim's face. She acknowledged saying in her statement that the victim told the appellant, "'I have a gun." She also acknowledged saying that she saw the appellant get his gun out of the Hummer's "glove box," which was in front of the passenger seat. The defense showed Smith a photograph of the Hummer's interior, and she acknowledged that the vehicle did not have a glove box. Smith said that she did not see the victim vandalize the Hummer and that the man who intervened was dressed in all-white clothing. She did not remember hearing the appellant tell the victim that he was going to blow the victim's brains out.

Joseph Sneed testified that he was the man wearing white clothing who tried to intervene on February 6, 2009. He acknowledged that he had ten prior misdemeanor theft convictions and three prior aggravated robbery convictions but said he had been changing his life in the past few years. On the night of the shooting, a religious organization sent Sneed to Panera Bread near Villa Catrioti to pick up leftover bread to distribute to the community. As Sneed was walking on the sidewalk, he saw a group of people. The group included the victim, who was standing on the sidewalk. Sneed said that the victim appeared to be arguing with a woman standing behind two vehicles, that the victim used the "'f' word" a couple of times, and that the victim was laughing. Sneed said the woman "was a little bit aggravated." The appellant walked between two vehicles and entered the passenger side of a Hummer.

Sneed testified that he turned to leave and heard a female scream. He thought someone was hitting a woman, so he ran onto the sidewalk. Sneed said the appellant had a gun, was "a little paranoid," and was pointing the gun "at everything that [moved]." Then the appellant focused the gun on the victim. Sneed stood in front of the appellant and told him to put the gun down. Sneed said that the appellant's eyes were bloodshot, that he was "frothing" at the mouth, and that he was saying, "'Arrrg, arrg.'" The appellant pointed the gun at Sneed, and Sneed realized the appellant was going to shoot the victim. Sneed jumped out of the way, and the appellant shot the victim. At the time of the shooting, the appellant was standing about ten feet away from the victim, and the appellant's wife was standing a

-4-

few feet behind the appellant. The victim's children were holding the victim's arms. After the shooting, the appellant's wife fainted, and the victim's children screamed. The appellant put the gun into his back pocket and went to his wife. Sneed said that he never heard the victim threaten anyone, that he did not see the victim push the appellant's wife, and that he did not see the appellant put the gun to the victim's head.

On cross-examination, Sneed testified that the victim was upset, not angry, and that the victim told the appellant, "'I'm not afraid of you.'" Sneed said that when he moved out of the way, the appellant "leaned in and [made] a couple of grunts." The appellant extended his arm, drew his arm back in, extended his arm again, and shot the victim. Sneed said that "there was a mental contemplation going on in [the appellant's] mind. Something was working in his mind." The appellant was paranoid, but he was not scared. Sneed said that the Hummer and the Denali were parked within their parking spaces and that he did not see the appellant use a cellular telephone during the altercation.

Steven Pilgreen testified that on February 6, 2009, he was working at Panera Bread. When Pilgreen's shift ended, he left the business and began walking to his vehicle. He heard yelling and saw two families arguing. He said he heard a woman shout, "'You don't need to vandalize that vehicle.'" Pilgreen dialed 9-1-1 on his cellular telephone because he thought a fight could occur and heard a gunshot. The State played an audio recording of Pilgreen's call, and he acknowledged that a gunshot and chaos could be heard. After the shooting, Pilgreen ran to the group and tried to calm the victim's children and prevent them from attacking the appellant. The victim was lying on the sidewalk about ten feet away from the appellant, and a man wearing a robe was administering CPR to the victim. Pilgreen did not know if the victim was alive. The appellant's wife was lying on the sidewalk behind the appellant. When the police arrived, the appellant surrendered to them.

On cross-examination, Pilgreen testified that he did not hear any threats. However, he acknowledged that an argument was in progress when he arrived and that he did not hear the entire argument. Pilgreen saw the appellant with a gun. After the shooting, the appellant appeared shocked and put the gun into his back pocket.

Nicholas Turpin testified that on the evening of February 6, 2009, he was sitting in his car in the Panera Bread parking lot. Turpin heard a gunshot, jumped out of his car, and ran to the victim, who was propped against a window. Turpin and Joseph Sneed put the victim onto the ground and started CPR. Shortly thereafter, Turpin stopped working on the victim and told the appellant to put the gun down, step away, and calm down. Turpin said the appellant told him, "'Don't threaten me, or my wife.'" Turpin said that the appellant was "very angry in his eyes," that the appellant "reached back to pull the gun out, but never did," and that he felt very threatened and scared by the appellant. Turpin said he had not

threatened the appellant.

Officer Jason Pynkala of the Memphis Police Department (MPD) testified that he and two other officers responded to the shooting. When they arrived, the appellant had his back to them, and the officers saw a handgun in the back pocket of his pants. The officers drew their weapons. Officer Pynkala removed the gun from the appellant while the other officers held the appellant at gunpoint. The gun was a .45 caliber Compact Wilson. On cross-examination, Officer Pynkala acknowledged that the appellant was cooperative and that the appellant put up his hands when the officers ordered.

Officer Erik Jensen of the MPD testified that he was one of the officers who responded to the shooting. He said that when he arrived at the scene, a large crowd was pointing and saying that "'he's over there, he's over there.'" Officer Jensen got his assault rifle out of his patrol car. Other officers approached the appellant, and Officer Pynkala took a gun out of the appellant's back pocket. Officer Jensen said that the appellant's wife was "sometimes sitting and sometimes walking around and talking to people, kind of agitated." He said that one of the victim's sons was upset and pacing and that the son said, "'She needs to be arrested, too, she started it, she needs to be arrested, it's her fault too.'" Officer Jensen said the appellant's wife answered, "'F[***] you, I hope he dies, it's your fault, too.'"

Dr. Lisa Funte, the Medical Examiner for Shelby County, testified as an expert in forensic pathology about the victim's autopsy report. The victim was six feet, one inch tall and weighed 263.5 pounds. He had a gunshot wound in the right side of his chest. The bullet traveled front to back, right to left, and downward. The bullet damaged the victim's liver and aorta, struck a vertebra, and exited the left side of his back. The victim bled to death, and no soot or stippling was on the victim's clothing or skin, meaning that the handgun's muzzle was at least four feet away from the victim at the time of the shooting. The victim's cause of death was a gunshot to the chest, and the manner of death was homicide. The victim's blood contained .14 milligrams per deciliter of alcohol, almost twice the legal limit for driving a vehicle in this state. Dr. Funte could not say what position the victim was in when he was shot. However, on cross-examination, Dr. Funte acknowledged that the track of the bullet was consistent with the victim's having been "advancing" on someone.

Robert "Colt" Schwerin, III, the victim's son, testified that at the time of the victim's death, the victim was fifty-two years old and worked as an amp mechanic for FedEx. On the night of February 6, 2009, Colt's family was celebrating a birthday at Villa Castrioti. The victim drank a glass of vodka over ice and one beer during dinner. After dinner, everyone walked to their vehicles. Colt; his brother, Dallas; Asia Smith; and Katie Johnson went to Colt's truck while the victim and Colt's sister, Savannah, went to the victim's Denali. Colt drove to the victim's Denali and saw the appellant's wife standing behind the vehicle. Colt

parked his truck, and everyone got out to find out what was happening. The appellant's wife was saying that the victim had vandalized the appellant's Hummer, and she and the victim were yelling profanities at each other. Colt was embarrassed by their behavior. The appellant's wife walked away, and Colt went to the victim, who was standing on the sidewalk. Colt said the victim told him, "'I took the light cover off and that's all I did.'" Colt said that the appellant's wife returned with the appellant and that the appellant "picked up where the wife left off."

Colt testified that the appellant went to the passenger side of the Hummer and opened the door. Colt heard someone scream and saw the appellant with a gun. He said that the appellant was standing about six feet from the victim and that the appellant was "moving [the gun] around, just kind of in a 'stay away from me' kind of deal." Colt said that the appellant and the victim kept arguing and that the victim had his hands up "like whoa." Colt said that the appellant's wife was "in [the victim's] face" and was hitting the victim's chest. Colt said that the victim pushed her away and that the appellant said, "'If you touch my wife again I'll blow your f[***ing] brains out.'" The appellant's wife hit the victim on the chest again, and the victim pushed her away again. Colt and Dallas were standing on the sidewalk with the appellant and the victim. Joseph Sneed stood in front of the appellant and tried to diffuse the situation. When Sneed moved out of the way, the appellant aimed and shot the victim, who collapsed. Colt said he told the appellant, "'You shot my dad, you ass-hole, what have you done?'" He said the appellant told him, "'Get away, or I'll shoot you, too.'" Colt stated that the appellant pointed the gun at him and that he "felt like I could already feel a bullet inside me and I didn't like what it felt like and so I turned around and basically walked off like a scared dog with my tail between my legs still yelling." The appellant's wife fainted, and the appellant put the gun into his pocket and went to his wife. When the police arrived, Colt yelled for the officers to arrest the appellant's wife. He said she told him, "'F[***] you, I don't really care if you father lives, or dies.'" Colt said that the victim was cursing and yelling during the altercation but that he never heard the victim threaten the appellant, the appellant's wife, or the appellant's dog.

On cross-examination, Colt testified that the victim acted normal during and after dinner; the victim did not act intoxicated. Colt acknowledged that the victim had a temper and that the victim put his hands on the appellant's wife twice. Colt did not try to restrain the victim and did not see Dallas or Savannah try to restrain him. The victim was angry but was not out of control. Colt said that he did not see the appellant use a cellular telephone during the altercation but that he saw the appellant's silhouette "fumbling around in the center console" of the Hummer. The appellant got the gun and pointed it at Colt, the victim, and everyone standing around the victim.

Twenty-two-year-old Dallas Schwerin, Colt's older brother, testified that the victim

had been drinking alcohol at home prior to dinner at Villa Castrioti. After dinner, Dallas left the restaurant with Colt, and they drove to the victim's Denali. Dallas saw the appellant's wife standing behind the Denali and a Hummer. She was irate and was arguing with the victim, who was standing on the sidewalk in front of the vehicles. The appellant's wife claimed that the victim had vandalized her husband's vehicle, and she and the victim were yelling profanities at each other. Dallas said that he asked the appellant's wife if he could take the victim and leave but that she said, "No, both vehicles are staying here." A second woman went into the restaurant and returned with the appellant. The appellant spoke with his wife, walked between the two vehicles, went to the victim, and spoke with the victim. Then the appellant, his wife, and the victim began arguing. However, no threats were made. Dallas said the appellant's wife was "in [the victim's] face" and poked him in the chest. Dallas said the victim tried to back away and was "fanning his arms."

Dallas testified that the appellant went into the passenger side of the Hummer, went to the victim, and put the muzzle of a gun into the victim's mouth. Then the appellant backed away slightly. Dallas went to the victim, and the victim pushed him away with the victim's left forearm. Dallas said that he heard a "'bang,'" that he turned around, and that the victim fell to the ground. The appellant's wife fainted and also fell. The appellant put the gun into the back pocket of his pants, and Dallas telephoned 911. A man wearing a white robe administered CPR to the victim. Dallas never heard the victim threaten the appellant or his wife.

On cross-examination, Dallas acknowledged that he gave a statement to the police and that his statement did not include many of the statements made by the appellant's wife. He also acknowledged that the victim had threatened him and Colt previously. However, Dallas had never seen the victim get physical or threaten anyone else. Dallas said the victim started the altercation by vandalizing the appellant's Hummer. When Dallas approached the victim just before the shooting, the victim pushed him back in order to protect him. Dallas did not see the appellant shoot the victim. However, he said the appellant "retracted" from the victim just before the shooting. After the shooting, Dallas saw the victim fall and saw the appellant pointing the gun at the victim.

Sixteen-year-old Savannah Schwerin testified that on the night of February 6, 2009, she left Villa Castrioti with the victim. When they got to the victim's Denali, Savannah noticed that a Hummer was parked too close for her to get into the driver's side of the Denali. Savannah was going to drive the Denali because the victim had been drinking alcohol and because she needed to practice driving. She got into the driver's seat by crawling through the passenger side. The victim was angry and remained outside the vehicle. Savannah heard the victim arguing with the appellant's wife. Both of them were cursing, and Savannah was embarrassed and scared. Savannah motioned for the victim to get into the Denali, but he

continued to argue with the appellant's wife. The appellant came out of the restaurant and began arguing with the victim. Savannah said the appellant told his wife that the victim was a "wimp." The appellant went to the Hummer, opened the passenger-side door, and appeared to be rummaging for something. When he came out of the vehicle, he was holding a gun. The appellant went to the victim and put the gun to the victim's chest. Then the appellant put the gun to the victim's mouth. Savannah got out of the Denali and walked to the back of the vehicle. She heard a gunshot and ran to the victim, who was lying on the ground. The appellant's wife also was lying on the ground. Savannah said that she never heard the victim threaten anyone and that she never saw him hit anyone.

On cross-examination, Savannah testified that prior to eating at the restaurant, the victim drank "little beer bottles" at home. When Savannah got into the Denali after dinner, she did not crank the engine. Savannah did not see the victim put his hands on the appellant's wife or Dallas, and she never saw the appellant use a telephone during the altercation. When the appellant came out of the Hummer and put the gun on the victim, the victim backed away. Savannah did not try to restrain the victim, and she did not see anyone else try to restrain him. She did not see the appellant point the gun at anyone other than the victim. At the conclusion of Savannah's testimony, the State rested its case.

Eddie Heaston testified for the appellant that he was a supervisor for the Memphis 911 call center. The center received a call from the appellant's cellular telephone at 9:00:43 p.m. on February 6, 2009. The phone rang the call center for one minute, twelve seconds. When the 911 operator finally answered, she did not hear anything. The operator called the appellant's cell phone three times, but the calls went to the appellant's voicemail.

Officer Marlon Wright of the MPD testified that he arrived at the scene at 10:30 p.m. and that the victim was in an ambulance. He found a .45 caliber spent shell casing on the sidewalk. He also found a t-shirt, eyeglasses, and blood. He acknowledged that photographs taken of the appellant's Hummer showed that the vehicle's lens caps had been removed from the headlights.

Jimmy Youngman, an auto body repair technician, testified that in February 2009, he performed some repair work on the appellant's Hummer. The ring on the left fog light had been torn off, and the lens caps had been removed from the headlights.

Katheryn Coleman, the appellant's wife, testified that February 6, 2009, was her fifty-second birthday. Mrs. Coleman ate dinner with her mother in Collierville, then she and her mother went to Memphis to eat dessert at Villa Castrioti. Mrs. Coleman said that when she pulled into the parking lot, she saw the appellant's Hummer and saw the victim "pulling parts off the car and chunking them to the side." Mrs. Coleman parked her car, approached the

victim, and asked him what he was doing. She said the victim told her, "'I did it.'" Mrs. Coleman thought the victim may be mentally unstable or intoxicated, so she was going to walk away from him for her safety and write down the Denali's license tag number. She said that the victim was angry and that she tried to "make peace" with him. She said she told him, "'Sir, neither one of our vehicles are across the line, I'm not sure why you're upset.'" The victim began cursing and yelling, shook his fists, and berated her. Mrs. Coleman backed up, and the victim continued to yell at her while she tried to memorize his license tag number. She said she got scared and told her mother to get the appellant. She said she never told the victim that he could not leave and never blocked the Denali. The Denali's engine was turned on, and at least two people were inside.

Mrs. Coleman testified that a young male arrived and told the victim, "'Dad, let's go, let's get in the car, let's leave this alone, it's not worth it.'" However, the victim continued to curse, yell, and shake his fist at her. The appellant arrived, and Mrs. Coleman told him that the victim had vandalized the Hummer. She said she told the appellant that she was scared and that "there might be a problem." The appellant went to the victim. At first, the appellant was calm. Mrs. Coleman said that the appellant's body language was "animated" and that he asked the victim what was going on. She said that the victim's fists were down by his side, that his chest was "puffed out," and that he was "rocking back and forth on his feet like he was about to explode." The appellant and the victim talked for one or two minutes. Then the appellant went to the Hummer and opened the passenger door. He approached the victim, and Mrs. Coleman thought he was holding the victim by the victim's shirt. The appellant backed away from the victim, but the victim moved toward the appellant. Mrs. Coleman said she jumped in front of the victim, put her hands up, and tried to stop him. The victim knocked her down with his right arm, and Mrs. Coleman heard a gunshot. She stood up, saw the victim on the ground in a pool of blood, and fainted. When she woke, the appellant was standing over her.

Mrs. Coleman testified that she yelled at the victim during the altercation but that she never cursed at him and never heard the appellant curse at him. After the shooting, Mrs. Coleman heard someone say, "'There she is, go get her.'" Mrs. Coleman did not respond to the statement and never said she wished the victim would die. She acknowledged that she gave a statement to police. However, she said that she "wasn't doing very well" when she gave the statement and that the statement was "[f]airly" accurate.

On cross-examination, Mrs. Coleman testified that she had consumed two glasses of wine on the night of February 6. She said that she was "talking back" to the victim, that he called her names, and that she called him "a fat head." She said she called the appellant to the scene because she did know what to do and did not know what the victim was going to do. She said that the victim was "very very big" and that she was scared of him. She

acknowledged that she could have gotten back into her Land Rover but said that she did not want to leave because she did not know what the victim would do to the Hummer. She never got in the victim's face and never saw a gun. Mrs. Coleman told the police that the appellant went to the Hummer during the altercation, but the police did not put that information in her statement. She said she saw the appellant and the victim close together but did not see "any fists flying." Mrs. Coleman denied "escalating" the situation and said the victim's "own child was scared of him [and] wouldn't even go up to him." She did not hear the victim make any threats, but she could not hear what the victim and the appellant were saying to each other. She said she was not intoxicated and never said she hoped the victim died.

The sixty-year-old appellant testified that he had three children and five grandchildren, had been in the real estate business for thirty-eight years, and had a valid handgun carry permit in February 2009. On the night of February 6, 2009, the appellant went to look at an ivory and jade collection at the Peabody Hotel and drank two glasses of wine. He left the hotel about 8:20 p.m., telephoned his wife, and arranged to meet her and her mother at Villa Castrioti. The appellant parked in the restaurant parking lot, went inside the restaurant, and ordered a glass of wine. His mother-in-law came inside and told him that he needed to go outside. The appellant walked into the parking lot and noticed a large crowd. He saw his wife, who was standing between his Hummer and a Denali, and walked to her.

The appellant testified that he heard "a big man up there hollering something" and that he asked his wife what was going on. Mrs. Coleman told him that she had caught the victim vandalizing their Hummer and that the victim had been cursing at her and threatening her. The appellant said that his wife was upset and that she said that "he thinks we parked too close to him." The appellant stated that he "didn't think that there could be that much to it" and that he walked toward the victim. He said the victim asked him, "'Are you the pimpy son-of-a-bitch in this big car?'" The appellant answered, "'[W]ell, you've got a big nice car, too.'" He said that the victim "cussed [him] out pretty good"; that the victim was "talking loud, rocking back and forth"; that the victim's eyes were red and bloodshot; and that he thought the victim was "either on something, or drunk." He said the victim stated, "I'm going to kill you, that bitch back there and your dog."

The appellant testified that he was shocked and realized he had "stepped into a bad situation." He backed up and opened the rear passenger door of the Hummer. He needed police help and dialed 9-1-1, but no one answered. He said that when 911 did not answer, he "felt like I better protect myself and my family" from the victim. The appellant kept a pistol in a holster between the Hummer's driver's seat and center console. He took the pistol out of the holster and made sure the safety was on. He was not intending to use the gun but thought the victim would leave him and his wife alone if he showed the gun to the victim. The appellant closed the door of the Hummer and waited five to fifteen seconds. He said that

the victim cursed at him at least one more time and that he walked up to the victim so that the victim could see the gun.

The appellant testified that he was "pretty rattled and upset," that he "got right up close" to the victim, and that he put the gun between the victim's nose and mouth. The appellant said he told the victim, "I'm scared, my wife's scared, we're scared of you and please leave us alone." Then the appellant backed up about twenty feet from the victim. The appellant said that a young man got in front of the victim and that the victim "hit him out of the way." The appellant's wife jumped in front of the victim, and the victim knocked her onto the sidewalk. The appellant said that he thought the victim was going to try to kill him and his wife and that the victim "came charging" at him. The appellant said he put up his left hand and told the victim, "'Stop, stop, stop.'" The appellant shot the victim one time.

The appellant testified that the victim was four to five feet from him at the time of the shooting and that no one got in front of the victim before the shooting. After the appellant shot the victim, the victim fell back. The appellant said the young man ran up to the appellant and said, "'That's my dad, that's my dad, I want to go help my dad.'" The appellant told the young man to help the victim and call 911. The appellant put the gun into his back pocket and went to his wife, who had fainted. Then he waited for the police. When the police arrived, he told the officers that he shot the victim because the victim assaulted his wife and "was coming at me."

On cross-examination, the appellant testified that he was afraid of the victim because the victim was "a pretty good size and he was hostile and angry and apparently drunk, threatening to kill me and my wife." He acknowledged that despite his being afraid of the victim, he got the gun out of the Hummer and walked up to the victim. He put the gun between the victim's nose and mouth but backed away so the victim could leave. He said he did not put the gun into the victim's mouth and never saw a man dressed in white clothing. He said that the young man walked up to the victim and that the victim knocked the young man back. The appellant's wife got between the victim and the appellant, and the victim knocked her to the ground. The victim charged at the appellant, and the appellant told him to stop two or three times. When the victim got within four or five feet of the appellant, the appellant shot him. The appellant said that he never got angry on the night of February 6, 2009, and that he did not remember saying, "'If you touch my wife again I'm going to blow your brains out.'"

Officer Eric Kelly of the MPD testified on rebuttal for the State that he responded to the shooting on February 6, 2009, and approached the crowd with other officers. An officer took the gun out of the appellant's back pocket, and Officer Kelly walked the appellant to his patrol car. He said Mrs. Coleman was "being loud and . . . was asking questions."

Officer Kelly said that she asked him "what was going on with her husband" but that he would not communicate with her and told her that "she needed to go back and talk to the officer that she just got through talking to." He said that a witness wearing all-white clothing was present, that the man "looked like Jesus," and that the man was "very visible."

On cross-examination, Officer Kelly acknowledged that he testified at a prior hearing related to this case. He also acknowledged stating during the hearing that he spoke with Mrs. Coleman "just briefly, to ask her name, date of birth and [get] a real general statement from her in regards to what she witnessed."

The jury found the appellant guilty as follows: Count 1, second degree murder; count 2, the assault of Joseph Sneed as a lesser-included offense of aggravated assault; count 3, the aggravated assault of Colt Schwerin; and count 5, the assault of Nicholas Turpin. The jury acquitted the appellant of count 4, employing a firearm during the commission of a dangerous felony. After a sentencing hearing, the trial court sentenced the appellant as a Range I, standard offender to eighteen years for the second degree murder conviction, a Class A felony; three years for the aggravated assault conviction, a Class C felony; and eleven months, twenty-nine days for the assault convictions, Class A misdemeanors. The trial court ordered that the appellant serve the sentences concurrently for an effective sentence of eighteen years in confinement.

## II. Analysis

### A. Sufficiency of the Evidence

The appellant contends that the evidence is insufficient to support the convictions. Regarding the second degree murder conviction, he contends that the evidence establishes that he shot the victim in self-defense. In the alternative, he contends that, at most, he is guilty of voluntary manslaughter. The appellant contends that the evidence is insufficient to support his conviction for the aggravated assault of Colt Schwerin because the appellant pointed the gun at Colt in order to protect himself and his wife after Colt approached him and yelled at him; that the evidence is insufficient to support his conviction for the assault of Joseph Sneed because he never directly threatened Sneed; and that the evidence is insufficient to support his conviction for the assault of Nicholas Turpin because he did not point the gun at Turpin and was only "attempting to continue to protect himself and his wife when the emotions of everyone on the scene were running high." The State argues that the evidence is sufficient to support the convictions. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most

favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307 (1979); <u>see also</u> Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. <u>See</u> <u>State v. Cabbage</u>, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. <u>See</u> <u>State v. Bland</u>, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. <u>See</u> <u>id.</u> Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. <u>See</u> <u>State v. Tuggle</u>, 639 S.W.2d 913, 914 (Tenn. 1982).

Regarding the appellant's second degree murder conviction, second degree murder is the knowing killing of another. Tenn. Code Ann. § 39-13-210(a)(1). A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. Tenn. Code Ann. § 39-11-106(a)(20). Our Code provides that the use of force likely to cause death or serious bodily injury may be justified when a person (1) "has a reasonable belief that there is an imminent danger of death or serious bodily injury"; (2) "[t]he danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time"; and (3) "[t]he belief of danger is founded upon reasonable grounds." Tenn. Code Ann. § 39-11-611(b)(2). Self-defense is a fact question for the jury. <u>State v. Clifton</u>, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994); <u>State v. Ivy</u>, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993). When a defendant relies upon a theory of self-defense, it is the State's burden to show that the defendant did not act in self-defense. <u>State v. Sims</u>, 45 S.W.3d 1, 10 (Tenn. 2001).

The appellant claims that the jury erroneously rejected his claim of self-defense because the evidence shows that the victim was larger than he, was behaving aggressively toward him and his wife, had the opportunity to leave but continued to harass and intimidate them, and knocked his wife to the ground. The appellant also notes that he fired only one shot at the victim, who he thought was attacking him.

Taken in the light most favorable to the State, the evidence shows that the victim and Mrs. Coleman were arguing and cursing at each other. The appellant arrived, and he began arguing and cursing with the victim. When the victim pushed Mrs. Coleman away, the appellant threatened to kill him. Although the appellant claimed that he was afraid of the victim, he went to the Hummer, got his pistol, and physically confronted the victim by grabbing the unarmed victim and putting the muzzle into the victim's mouth. Joseph Sneed

tried to diffuse the situation and calm the appellant but realized that the appellant was going to shoot the victim. When he stepped out of the way, the appellant shot the victim once in the chest. All of the State's witnesses testified that they never heard the victim threaten the appellant, and none of them testified that the victim was moving toward the victim when the appellant shot him. The jury, not this court, was in the best position to judge the credibility of the witnesses, and the jury obviously accredited the testimony of the State's witnesses. This court does not second-guess factual determinations made by the jury, and it was within the jury's province to reject the appellant's theory of self-defense. The evidence is more than sufficient to support the appellant's conviction for second degree murder.

Regarding the appellant's aggravated assault and assault convictions, aggravated assault as charged in the indictment occurs when a person intentionally or knowingly commits an assault by using or displaying a deadly weapon. Tenn. Code Ann. § 39-13-102(a)(1)(B). The "deadly weapon" in this case was a firearm. See Tenn. Code Ann. § 39-11-106(a)(5)(A). A person commits assault when the person "[i]ntentionally or knowingly causes another to reasonably fear imminent bodily injury." Tenn. Code Ann. § 39-13-101(a)(2).

Taken in the light most favorable to the State, the evidence shows that during the altercation, Joseph Sneed stepped between the appellant and the victim. Sneed testified that the appellant pointed the gun at him, that he realized the appellant was going to shoot the victim, and that he jumped out of the way. After the appellant shot the victim, Nicholas Turpin told the appellant to put the gun away and calm down. The appellant reached back as if he was going to get the gun and told Turpin, "'Don't threaten me, or my wife.'" Turpin said he felt very threatened and scared by the appellant. Colt Schwerin testified that he told the appellant, "'You shot my dad, . . . what have you done?'" He said that the appellant pointed the gun at him, that the appellant threatened to shoot him, and that he "could already feel a bullet" and "walked off like a scared dog." The evidence is sufficient to support the appellant's conviction for the aggravated assault of Colt Schwerin and his convictions for assaulting Joseph Sneed and Nicholas Turpin.

B. Newly Discovered Evidence

The appellant contends that he is entitled to a new trial based on newly discovered evidence that he suffered from a bipolar disorder at the time of the crimes. The State contends that the trial court properly determined that the appellant was not entitled to a new trial. We agree with the State.

The record reflects that soon after the jury convicted the appellant, he attempted suicide by putting ether into his nostrils and was hospitalized at Memphis Mental Health

-15-

Institute (MMHI) for almost one month. In the appellant's motion for new trial, he raised a claim of newly discovered evidence in that doctors at MMHI diagnosed him with Bipolar I Disorder with Psychotic Features. At the motion for new trial hearing, no witnesses testified. However, the appellant presented numerous affidavits in support of his claim.

Dr. Kayla Fisher, a licensed psychiatrist and the Clinical Director for the MMHI, stated by affidavit that she had interviewed the appellant and his long-time psychiatrist, Dr. Richard Farmer; that she had reviewed the trial transcript; and that she had reviewed information collected about the appellant while he was at the MMHI. She concluded that the appellant suffered from Bipolar I Disorder with Psychotic Features, which "severely and negatively impacted his personal life." The appellant had experienced symptoms of the disorder for most of his adult life and "spent most of the time in recent years suffering from mania with psychotic features." However, he was not diagnosed with the illness until after the jury convicted him in this case and he attempted suicide. Dr. Farmer had suspected that the appellant suffered from Bipolar I Disorder in 2008 but diagnosed him with Major Depressive Disorder instead. Due to the missed diagnosis, Dr. Farmer "missed capturing the perceptual disturbance of paranoia Mr. Coleman experienced." Dr. Fisher concluded that the victim's size, intoxication, and aggressive actions on the night of February 6, 2009, along with the appellant's "alcohol consumption in the face of mania of Bipolar I Disorder," caused him to "exhibit paranoid and bizarre behavior" and believe his and his wife's lives were in imminent danger.

Dr. Richard Farmer, the appellant's psychiatrist for over fifteen years, stated by affidavit that the last time he met with the appellant prior to the shooting was October 17, 2008. At that time, the appellant "discussed 'some high periods' of feeling 'real and normal happiness,'" and Dr. Farmer "questioned" the presence of Bipolar Disorder without Psychotic Features. However, he did not have sufficient information or indications to diagnose the appellant as bipolar and diagnosed him with Major Depressive Disorder. After the appellant was convicted in this case and Dr. Farmer spoke with Dr. Fisher, he diagnosed the appellant with Bipolar I Disorder.

Leslie Ballin and Steve Ferese stated by almost-identical affidavits that they represented the appellant at trial. Counsel asked the appellant if he had any mental health issues, and the appellant told them that he was seeing Dr. Farmer. The appellant also told them that Dr. Farmer told the appellant he was "borderline Bipolar." However, the appellant claimed that "Dr. Farmer didn't know what he was talking about." Counsel did not see any indications that the appellant suffered from a mental illness and determined that his best defense was self-defense and the defense of his wife. They never considered a mental health defense, never contacted Dr. Farmer, and did not seek an evaluation of the appellant by a mental health professional. Had counsel known the appellant suffered from Biopolar I

Disorder with Psychotic Features, the diagnosis would have strengthened the appellant's claims of self-defense and defense of his wife because the appellant's paranoia increased his fear and perception of imminent danger.

The appellant stated by affidavit that he had been under the care of Dr. Farmer since the mid-1990's and that Dr. Farmer prescribed medications to him for anxiety and depression. Dr. Farmer never told the appellant that he had Bipolar I Disorder. Although Dr. Farmer said the appellant might be "borderline Bipolar," he also told the appellant that he was not bipolar. After the appellant was charged in this case, Dr. Farmer told him to tell his attorneys that Dr. Farmer could provide them with helpful information. The appellant asked Mr. Ballin and Mr. Ferese four or five times if they had talked with Dr. Farmer and learned they had not spoken with him. Counsel told the appellant that they would have to share Dr. Farmer's information with the State and that they did not want to do that. Therefore, counsel never spoke with Dr. Farmer. After Dr. Fisher diagnosed the appellant with Bipolar I Disorder with Psychotic Features, she altered his medications, and his condition "greatly improved."

Katheryn Coleman stated by affidavit that she and the appellant had been married for twenty-one years, that he drank alcohol regularly, and that he often drank daily and "to excess." The appellant also had mood swings and irritability that concerned her and caused trouble in their marriage. In November 2000, Mrs. Coleman told Dr. Farmer that she thought the appellant might be bipolar. However, Dr. Farmer told her that the appellant was not bipolar or was "at most borderline." Mrs. Coleman told trial counsel that the appellant was suicidal and under the care of Dr. Farmer.

Raymond Coleman, the appellant's son, stated by affidavit that he did not know the appellant was suffering from Bipolar I Disorder with Psychotic Features until Dr. Fisher made the diagnosis after trial. Raymond thought the appellant's defense was "a clear cut case of self-defense" and did not associate the appellant's mental health condition with his actions on the night of February 6, 2009, until Dr. Fisher's diagnosis.

Counsel argued at the motion for new trial hearing that the appellant was entitled to a new trial based on newly discovered evidence because the appellant had a mental illness, Bipolar I Disorder with Psychotic Features, that was undetected before trial. Counsel argued that the appellant used reasonable diligence in seeking the evidence because the appellant's trial attorneys did not have knowledge of his illness before trial. While the appellant told trial counsel that he was seeing a psychiatrist and that he might be borderline bipolar, trial counsel, who were experienced attorneys, did not see any indications from the appellant or his family that he suffered from a mental illness. Moreover, even if trial counsel had contacted Dr. Farmer, they would have learned that the appellant was being treated for

-17-

depression, marital problems, and alcohol abuse. They would not have discovered that he was bipolar because Dr. Farmer had not diagnosed him with that condition. Counsel also argued that the newly discovered evidence was material because the appellant's mental illness created paranoia that "verified his honest belief that he and his wife faced imminent danger of death or serious bodily injury." Therefore, the appellant's mental illness supported his claim of self-defense. Finally, counsel argued that the newly discovered evidence would have likely changed the result at trial because Dr. Fisher's testimony would have explained to the jury why the appellant, who had never been in trouble previously, perceived imminent danger of death or serious bodily injury. The trial court denied the appellant's motion for new trial.

This court has previously observed that the decision to "[grant or deny] a new trial on the basis of newly discovered evidence rests within the sound discretion of the trial judge." State v. Caldwell, 977 S.W.2d 110, 117 (Tenn. Crim. App. 1997). Accordingly, we will not overturn the trial court's decision absent an abuse of discretion. See State v. Meade, 942 S.W.2d 561, 565 (Tenn. Crim. App. 1996). It is the law of this state that

> a trial court should grant a defendant a new trial on the basis of
> newly discovered evidence when [(1)] the defendant has been
> reasonably diligent in obtaining evidence, [(2)] the materiality
> of the new evidence is apparent, and [(3)] the evidence is likely
> to change the result [of the trial].

State v. Singleton, 853 S.W.2d 490, 496 (Tenn. 1993) (citations omitted). All three prongs of the aforementioned test must be met before an appellant is entitled to a new trial based on newly discovered evidence. See State v. Nichols, 877 S.W.2d 722, 737 (Tenn. 1994).

We conclude that the trial court did not abuse its discretion by denying the motion for new trial. Regarding the first prong, reasonable diligence in attempting to discover the evidence, the trial court noted that the appellant told trial counsel "on a number of occasions" about his being treated by Dr. Farmer. The trial court held that counsel made a strategic decision not to talk with Dr. Farmer. However, the court stated that "even if they had spoken with Dr. Farmer, Dr. Farmer never reached the result that the defendant was bipolar with or without psychotic features."

The trial court did not state specifically whether the appellant satisfied the first prong of the test. In any event, we conclude that he failed to establish reasonable diligence. The appellant told trial counsel to speak with Dr. Farmer, and trial counsel knew Dr. Farmer considered the appellant "borderline Bipolar." Nevertheless, trial counsel made no effort to investigate the appellant's mental health and strategically decided not to talk with Dr.

-18-

Farmer. Granted, trial counsel would not have learned from speaking with Dr. Farmer that the appellant suffered from Bipolar I Disorder with Psychotic Features. However, Dr. Farmer obviously thought he could provide trial counsel with information that would be beneficial to the appellant's case, and speaking with him could have resulted in counsel's determining that a thorough investigation into the appellant's mental health was warranted. Instead, as noted by the State at the motion for new trial hearing, trial counsel "did nothing." We note that Dr. Fisher never concluded that the appellant's mental illness could not have been diagnosed before trial. In fact, she emphasized that the appellant exhibited symptoms of Bipolar I Disorder with Psychotic Features throughout his adult life and that Dr. Farmer repeatedly missed opportunities to diagnose him with that condition. Therefore, the appellant has failed to show reasonable diligence in attempting to discover the evidence. Given that the appellant must satisfy all three prongs of the test, his failure to satisfy the first prong alone justifies the trial court's denial of the motion for new trial.

### III.  Conclusion

Based upon the oral arguments, the record, and the parties' briefs, we affirm the appellant's convictions and the trial court's denial of the motion for new trial. However, the case is remanded to the trial court for correction of the judgments in counts 2 and 3. Regarding count 2, assault, the corrected judgment is to reflect that the trial court sentenced the appellant to eleven months, twenty-nine days, not three years. Regarding count 3, aggravated assault, the judgment is to reflect that the trial court sentenced the appellant to three years, not eleven months, twenty-nine days.

_____
NORMA McGEE OGLE, JUDGE